UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

YES I CAN LICENSED BEHAVIOR ANALYST
PLLC; TRIUMPH BEHAVIOR SUPPORT LLC,          Civ. A. No. 1:24-cv-7360-PAE
YES I CAN SERVICES INC; YICIF LLC;
METROPOLITAN MENTAL HEALTH PC;
ZAREPHATH INC.; YIC REALTY AZ LLC;
SIMCHA FELLER; and ROCHEL ITA FELLER,

                                    Plaintiffs,          **JURY TRIAL DEMANDED**

                  -vs-

GREEN TREE CAPITAL, LLC; DELAWHO HOLDINGS LLC;
JONATHAN BRAUN; YITZCHOK WOLF a/k/a ISAAC WOLF;
SARA BETYAKOV A/K/A SARAH BEITYAKOV;
MATTHEW STAFFORD; ARIEL BOUSKILA;
STEVEN BERKOVITCH; BERKOVITCH & BOUSKILA, PLLC;
ABC CORPORATIONS 1-10;
JOHN DOES 1-10; and JOHN DOE INVESTORS 1-10;

                                    Defendants.
-------------------------------------------------------------------X

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiffs, YES I CAN LICENSED BEHAVIOR ANALYST PLLC; TRIUMPH

BEHAVIOR SUPPORT LLC; YES I CAN SERVICES INC; YICIF LLC; METROPOLITAN

MENTAL HEALTH PC; ZAREPHATH INC.; YIC REALTY AZ LLC; SIMCHA FELLER;

and ROCHEL ITA FELLER (collectively "Plaintiffs"), as and for their Second Amended

Complaint against Defendants GREEN TREE CAPITAL, LLC; DELAWHO HOLDINGS

LLC; JONATHAN BRAUN; SARA BETYAKOV A/K/A SARAH BEITYAKOV;

MATTHEW STAFFORD; ARIEL BOUSKILA; STEVEN BERKOVITCH; BERKOVITCH &

BOUSKILA, PLLC; ABC CORPORATIONS 1-10; JOHN DOES 1-10; and JOHN DOE

INVESTORS 1-10 (collectively "Defendants"), state as follows, upon knowledge with respect

to their own acts and upon information and belief with respect to all other matters:

## NATURE OF THE ACTION

1.     This is an action against a merchant cash advance ("MCA") company that is controlled and manipulated, upon information and belief, by notorious criminal Defendant JONATHAN BRAUN, ISAAC WOLF, and/or other individuals such as Defendant SARA BETYAKOV and/or other John Doe Defendants to carry out fraudulent schemes to collect upon unlawful debts and otherwise fraudulently obtain funds from Plaintiffs (and hundreds of other similarly situated victims) through the use of their sham MCA agreements ("MCA Agreements") as further defined below.

2.     Plaintiffs here are victims of Defendants' unlawful lending and collection practices.

3.     Unfortunately, the type of conduct by Defendants here is a ballooning national problem that has raised the attention of both state and federal regulators.

4.     In November 2018, Bloomberg News and renowned journalist Bethany McLean (of Vanity Fair acclaim) published what would be the first in a series of groundbreaking news articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize out-of-state bank accounts.[1]

5.     The New York Legislature quickly took action, banning the use of out-of-state confessions of judgment in September 2019. In support, the Legislature cited Bloomberg News.

6.     Unfortunately, in-state confessions of judgment are still acceptable, which as described herein Defendants used to fraudulently obtain an *ex parte* judgment and asset freeze against Plaintiffs, even though half of the Plaintiffs are out-of-state residents.

---

[1] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html; https://www.bloomberg.com/confessions-of-judgment

7.    Plaintiff YES I CAN LICENSED BEHAVIOR ANALYST PLLC ("YIC") provides education and support for approximately 2,000 children with special needs in the Tri-State area.

8.    Plaintiff TRIUMPH BEHAVIOR SUPPORT LLC ("Triumph") is a Tri-state based ABA therapy provider serving more than 1,000 children and young adults struggling with autism.

9.    Plaintiff ZAREPHATH INC. ("Zarephath") provides care for approximately 1,200 children in Arizona, many of whom have experienced severe trauma, through specialized treatments.

10.    As discussed herein, the vital services rendered by these Plaintiffs to thousands of children and young adults has already been detrimentally impacted and are in further grave jeopardy because of Defendants' misconduct.

11.    As it relates to the substantive facts of this case, in short, during early 2024, YIC sought a loan to fund its operations.

12.    GREEN TREE CAPITAL, LLC's ("GREEN TREE's") agent/representative advised that such a "loan" could be arranged.

13.    On or about March 8, 2024, YIC entered into a Merchant Agreement with GREEN TREE (the "MCA Agreement").

14.    Under the MCA Agreement, GREEN TREE funded the sum of $2,000,000.00 to YIC (the "Loan").

15.    Plaintiff SIMCHA FELLER, who is a principal of YIC, was forced to enter into a personal guarantee under the agreement, and the other corporate Plaintiffs were forced to cross-collateralize the agreement.

16.     Defendant GREEN TREE, who was supposed to advance $2,500,000 under this agreement, in fact only advanced $2,000,000.

17.     Then, Plaintiffs were somehow supposed to pay back the sum of $3,749,999.00 by Defendants pulling $62,500.00 out of YIC's bank account every day for 60 days.

18.     In other words, Defendants were going to receive $1.75 million dollars in interest on a $2 million dollar loan (87.5%) in only 60 days.

19.     This is an effective interest rate in the triple digits (525%). The maximum interest rate permitted under the laws of New York is 16% civilly and 25% criminally. Accordingly, Defendants were taking interest that was **twenty-one times** above the amount allowed under the laws of the State of New York.

## THE PARTIES

20.     Plaintiff YES I CAN LICENSED BEHAVIOR ANALYST PLLC is a domestic professional limited liability company with its principal place of business located in Kings County, New York.

21.     Plaintiff TRIUMPH BEHAVIOR SUPPORT LLC ("TRIUMPH") is a New Jersey limited liability company with its principal and only place of business located at 36 Airport Road, Lakewood, New Jersey. TRIUMPH does not have any locations in New York.

22.     Plaintiff YES I CAN SERVICES INC is a domestic corporation with its principal place of business located in Kings County, New York.

23.     Plaintiff YICIF LLC is a domestic limited liability company with its principal place of business located in Kings County, New York.

24.     Plaintiff METROPOLITAN MENTAL HEALTH PC is a New Jersey professional corporation with its principal and only place of business located at 1564 Lemoine

Avenue, Fort Lee, New Jersey.  METROPOLITAN does not have any locations in New York.

25.    Plaintiff ZAREPHATH INC. is an Arizona corporation with its principal and only place of business located at 4856 E Baseline Road, Mesa, Arizona.  ZAREPHATH does not have any locations in New York.

26.    Plaintiff YIC REALTY AZ LLC is an Arizona limited liability company with its principal and only place of business located at 15205 N Kierland Blvd, Scottsdale, Arizona.  YIC REALTY AZ does not have any locations in New York.

27.    Plaintiff SIMCHA FELLER is a New York citizen with an address in Brooklyn, New York.

28.    Plaintiff ROCHEL ITA FELLER is a New York citizen with an address in Brooklyn, New York.

29.    Defendant GREEN TREE CAPITAL, LLC ("GREEN TREE") is a Connecticut LLC with a principal address allegedly at 265 Tresser Blvd, Stamford, CT 06901.

30.    However, upon information and belief, GREEN TREE CAPITAL, LLC actually operates out of New York, New York.

31.    Defendant DELAWHO HOLDINGS LLC ("DELAWHO") is a Delaware limited liability company.

32.    Upon information and belief, DELAWHO has no actual operations of its own, but rather is the criminal enterprise complained of herein through its associated entities such as Defendant GREEN TREE.

33.    Defendant JONATHAN BRAUN is an individual with a primary residence, upon information and belief, in Atlantic Beach, New York.

34.    Defendant BRAUN has long been associated with the MCA industry, and was the

subject of multiple MCA-related proceedings, including an action brought by the New York

Attorney General seeking permanent MCA-related injunctive relief, as discussed herein.

35.    Defendant YITZCHOK WOLF a/k/a ISAAC WOLF, is an individual with a

primary residence, upon information and belief, in Brooklyn, New York.

36.    Defendant WOLF has long been associated with the MCA industry, and is a

known associate and underling of Defendant BRAUN.[2]

37.    Defendant SARA BETYAKOV A/K/A SARAH BEITYAKOV is an individual

with a primary residence, upon information and belief, in Brooklyn, New York.

38.    Upon information and belief, Defendant BEITYAKOV has long been an

underling of Defendant BRAUN and WOLF in their MCA-related activities.[3]

39.    Defendant BEITYAKOV is the individual who has signed most of the legal

paperwork (such as affidavits in support of judgments) for DELAWHO's six MCA entities

claiming to be a manager or representative or the like.

40.    Defendant MATTHEW STAFFORD is an individual with an address, upon

information and belief, in Henderson, Nevada.

41.    Defendant STAFFORD has played a role similar to BEITYAKOV, and is the

individual who executed the affidavits used by Defendants to obtain the confession judgments

discussed herein.

42.    Defendant ARIEL BOUSKILA is an attorney based out of Rockland County, who

submitted the fraudulent judgments discussed herein.

---

[2] *See, e.g.*, <u>Haymount Urgent Care PC Et Ano v. Gofund Advance, LLC</u>, No. 22-cv-1245 (JSR), 2024 U.S. Dist. LEXIS 112752, at *27 (S.D.N.Y. June 26, 2024).
[3] *See, e.g.*, <u>Haymount Urgent Care PC Et Ano v. Gofund Advance, LLC</u>, No. 22-cv-1245 (JSR), 2024 U.S. Dist. LEXIS 112752, at *27 (S.D.N.Y. June 26, 2024).

43.    Defendant STEVEN BERKOVITCH is an attorney based out of Rockland County, who is the partner of Defendant BOUSKILA and who has represented and continues to represent Defendant GREEN TREE and its principals and associated MCA companies for years.

44.    Defendant BERKOVITCH & BOUSKILA, PLLC is a law firm with an address of 1545 US 202 Suite 101, Pomona, NY 10970, who submitted the fraudulent judgments discussed herein.

45.    Defendants ABC CORPORATIONS 1-10 are additional corporations and associated entities of GREEN TREE, whose identities are at this time unknown to Plaintiffs, but who are full participants in the fraudulent criminal enterprises discussed herein.

46.    Defendants John Does 1-10 are the principals of GREEN TREE, whose identities are at this time unknown to Plaintiffs, but who are full participants in the fraudulent criminal enterprises discussed herein.

47.    Defendants John Doe Investors 1-10 are individuals and organizations whose identities are at this time unknown to Plaintiffs, but who knowingly fund, assist, and profit from the fraudulent criminal enterprise discussed herein, with full knowledge of the nature of the activity in which the enterprises are engaged.

## **JURISDICTION**

48.    Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue by soliciting, targeting, and effectuating the New York Plaintiffs and the wire activity complained of herein from New York entities and their New York bank accounts, and has used the New York courts to try to enforce

and collect upon the unlawful agreement discussed herein.

49.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. §1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68 ("RICO").

50.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

51.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

52.     Venue is proper because Plaintiffs and Defendants regularly conduct business within this judicial district.

## COMMON FACTUAL ALLEGATIONS

### A.     The Predatory MCA Industry.

53.     The MCA Industry spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[4] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

54.     As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[5] The MCA Industry is a breeding ground for "brokers convicted of stock

---

[4] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[5] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans

scams, insider trading, embezzlement, gambling, and dealing ecstasy." *Id.* As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated." *Id.*

###### B. The Sham.

55.    Many states, like New York, have laws prohibiting predatory interest rates. In order to evade these civil and criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables." MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts. The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

###### C. The Bloomberg Awakening.

56.    For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018 when Bloomberg News published what would be the first in a series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[6]

57.    As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of

---

[6] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html

judgment, expressly citing the Bloomberg articles as its inspiration.

58.    Unfortunately, however, the Legislature left alone the confession of judgment process for New York residents, thereby allowing fraudulent MCA characters like Defendants to continue to perpetuate MCA frauds against parties like Plaintiffs.

59.    Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story." As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[7]

60.    Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, including Defendant BRAUN, alleging that their MCA agreements constitute criminally usurious loans.[8] Just a few months ago, this action resulted in a judgment against these MCA companies and their principals, including Defendant BRAUN, totaling more than $77 million dollars for usury and fraud due to illegally high-interest, short-term loans and undisclosed fees disguised as merchant cash advances, which followed a ruling in September 2023 that included the cancellation of all outstanding debts of the small businesses involved.[9]

61.    On July 31, 2020, the Securities and Exchange Commission shut down an MCA company named Par Funding. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small businesses across America."[10] The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars

---

[7] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60
[8] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping
[9] https://ag.ny.gov/press-release/2024/attorney-general-james-announces-historic-judgment-against-predatory-lender
[10] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm

in cash, and a private airplane.[11]

62.    On June 10, 2020, the Federal Trade Commission filed a complaint against Defendant BRAUN and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.[12]  The suit also alleged that BRAUN and the other defendants made unauthorized withdrawals from consumers' accounts and required businesses and their owners to sign confessions of judgment as part of their contracts, which allowed the defendants to go immediately to court and obtain an uncontested judgment in case of an alleged default.  The complaint alleged that the defendants unlawfully and unfairly used these confessions of judgment to seize consumers' personal and business assets in circumstances not expected by consumers or permitted by the defendants' financing contracts.  Just a few months ago, this resulted in a judgment of more than $20 million dollars, which followed an October 2023 permanent injunction ruling.[13]

63.    As reported by the FTC, the judgment followed a January trial in which a jury found that BRAUN, in his role with small-business funding company RCG Advances, which formerly did business as Richmond Capital Group, knowingly violated the Gramm-Leach-Bliley Act by deceiving small businesses about the amount of funding that Defendants would provide to and collect from them.

64.    The court issued a summary judgment decision and permanent injunction against BRAUN in October 2023. The injunction included a permanent ban from the merchant cash advance and debt collection industries.

65.    On August 3, 2020, the Federal Trade Commission filed a complaint against

---

[11] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html
[12] https://www.ftc.gov/system/files/documents/cases/192_3252_rcg_advances_-_complaint.pdf
[13] https://www.ftc.gov/news-events/news/press-releases/2024/02/court-enters-203-million-judgment-ftc-case-against-merchant-cash-advance-operator-jonathan-braun

Yellowstone Capital.[14] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." *Id.*  This resulted in a $9.8 million settlement by the MCA company.[15]

66.     On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[16]

67.     On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[17]  This resulted in a $27.4 million dollar settlement by the MCA company.[18]

68.     On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[19]

69.     As NBC News recently reported, however, the financial greed of predatory

---

[14] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[15] https://www.ftc.gov/legal-library/browse/cases-proceedings/182-3202-yellowstone-capital-llc-ftc-v
[16] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf
[17] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/
[18] https://www.njoag.gov/ag-platkin-announces-27-375-million-settlement-with-yellowstone-capital-llc-and-related-entities-over-allegations-of-unlawful-lending-servicing-and-collection-practices/
[19] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/

lenders, like Defendants, has only accelerated in the wake of Covid-19.[20]

### D. The Sea Change in Law.

70. Prior to the Bloomberg Awakening, courts routinely rejected attempts by small business victims seeking to vacate the many thousands of confessions of judgments filed by MCA companies. Courts primarily denied those attempts on the procedural basis that a plenary action must be filed instead of merely seeking to vacate by motion. One court went so far as to sanction the attorney for even bringing the motion. *See, e.g., Yellowstone Capital LLC v. Central USA Wireless LLC*, 2018 N.Y. Misc. LEXIS 2516, *2 (N.Y. Sup. Ct., Erie Cty Jun. 25, 2018) (citing *Yellowstone Capital, LLC v. Jevin*, Index No. 802457/2017 (N.Y. Sup. Ct. Erie Co. Oct. 6, 2017)).

71. The tide has since turned in the wake of the Bloomberg articles. Most notable is the decision by Judge Nowak, a Commercial Division Justice out of Erie County—a favorite forum for MCAs given Upstate New York's more conservative political leanings. *See McNider Mar., LLC v Yellowstone Capital, LLC*, 2019 N.Y. Misc. LEXIS 6165 (N.Y. Sup. Ct., Erie Cty Nov. 19, 2019). Notably, Judge Nowak reversed his own prior decision in *Yellowstone Capital, LLC v. Jevin*, *supra*, where he previously held that the very same Yellowstone agreement was not a loan as a matter of law. This time, upon further reflection, Judge Nowak not only upheld the claims of usury, but also upheld the RICO claims. Numerous courts have followed suit. *See, e.g., Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims); *LG Funding LLC v. United Senior Properties of Olathe LLC,* 122

---

[20] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167

N.Y.S.3d 309 (2d Dep't. 2020); *American Resources Corp. v. C6 Capital, LLC*, 2020 N.Y. Misc. LEXIS 10725, *6 (N.Y. Sup. Ct., Kings Cty. Dec. 16, 2020); *Funding Metrics LLC v. NRO Boston*, 2019 N.Y. Misc. LEXIS 4878 (N.Y. Sup. Westch. Cty. Aug. 28, 2019); *Funding Metrics, LLC v. D & V Hospitality*, 62 Misc.3d 966 (N.Y. Sup. Westch. Cty. Jan. 7, 2019), *rev'd on other grounds*.

72.    Numerous federal courts have also joined the revolution. *See Lateral Recovery LLC v. Queen Funding LLC*, Case No. 21-civ-9607 22, 2022 U.S. Dist. 129032 (S.D.N.Y. July 20, 2022) (upholding RICO claims under MCA agreement); *Fleetwood Servs. LLC v. Ram Capital Funding, LLC*, Case No. 20-cv-5120 (LJL), 2022 U.S. Dist. LEXIS 100837 at *32 (S.D.N.Y. June 6, 2022) (applying risk-transfer analysis to an MCA agreement to conclude agreement was a criminally usurious loan in granting summary judgment on merchant's unlawful debt RICO collection claims); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22-cv-1245 (JSR), 2022 WL 2297768, *16 (S.D.N.Y. June 27, 2022) (same); *Fleetwood Servs., LLC v. Complete Bus. Sols. Grp.*, 374 F.Supp.3d 361 (E.D. Pa. 2019) (same); *NRO Boston v. Funding Metrics*, 2018 U.S. Dist. LEXIS 239152 (E.D. Pa. May 23, 2018) (same); *Davis v. Richmond Capital Group*, 194 A.D.3d 516 (1st Dept. 2021); *NRO Boston LLC v. Yellowstone Capital LLC*, 2021 N.Y. Misc. LEXIS 1892 (Rockland Cty, April 9, 2021) (upholding RICO claims).

73.    So has New York's highest court. Most notably, a member of New York's highest court, recently advised in *dicta* that MCA transactions, like here, more closely resemble loans subject to New York's usury laws rather than bona fide sales of receivables:

> Although the GTR and CMS agreements are described as 'factoring' agreements, they do not bear several of the hallmarks of traditional factoring arrangements, in that FutureNet did not sell any identifiable receivable to GTR or CMS; GTR and CMS did not collect any receivables; GTR and CMS received fixed daily withdrawals from FutureNet's bank account regardless of whether or how much

FutureNet collected from or billed to its clients; and GTR and CMS did not bear the risk of nonpayment by any specific customer of FutureNet. The arrangements FutureNet entered with GTR and CMS appear less like factoring agreements and more like high- interest loans that might trigger usury concerns (*see Adar Bays, LLC v GeneSYS ID*, NE3d, 2021 NY Slip Op 05616 [2021]). Nevertheless, for the purpose of these certified questions, we are asked to assume the judgments rendered on those agreements are valid.

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 2021 N.Y. LEXIS 2577, *45, 2021 NY Slip Op 07055, 11, 2021 WL 5926893 (N.Y. Dec. 16, 2021).

**E.    The MCA Agreement is Substantively and Procedurally Unconscionable.**

74.    The MCA Agreement is an unconscionable contract of adhesion that is not negotiated at arms-length.

75.    Instead, the MCA Agreement contains one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

76.    Among these one-sided terms, the MCA Agreement includes: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, (3) moving or selling the business or any assets without permission from the MCA company, (4) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (5) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition of obtaining financing from other sources, (11) the maintenance of business interruption insurance,

(12) an assignment of lease of merchant's premises in favor of the MCA company, (13) the right to direct all credit card processing payments to the MCA company, (14) a power-of-attorney to settle all obligations due to the MCA Company and (15) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding…"

77.    The MCA Agreement is also unconscionable because it contains numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

78.    The MCA Agreement is also unconscionable because it is designed to fail. Among other things, the MCA Agreement is designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

79.    The MCA Agreement also contains numerous improper penalties that violate New York's strong public policy. Among these improper penalties, the MCA Agreement (1) entitles the MCA company to attorneys' fees, (2) accelerates the entire debt upon an Event of Default, and (3) requires the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

80.    The Daily Payment under the MCA Agreement described below was fixed and absolute and the agreement's reconciliation provision was a sham.

81.     Defendants did not maintain reconciliation departments and did not have anyone trained or otherwise dedicated to performing any reconciliation of a merchant's accounts.

**F.    The Enterprise Intentionally Disguises the True Nature of the Transactions.**

82.     Despite the documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)     The Daily Payments are fixed and the so-called reconciliation provision are mere subterfuge to avoid usury laws. Rather, just like any other loan, the Purchased Amount is to be repaid within a specified time;

(b)     The default and remedy provisions purport to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans seek to obligate the merchants to ensure sufficient funds are maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount becomes immediately due and owing;

(c)     While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount is paid, the merchants retain all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, the Enterprise merely acquires a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)     The transactions are underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)     The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables, but rather is unilaterally dictated by the Enterprise based upon the interest rate it wants to be paid. Indeed, as part of the underwriting process, the Enterprise does not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)     The amount of the Daily Payments is determined based upon when the Enterprise wants to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(g)     The Enterprise assumes no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements;

(h)    The Enterprise requires that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constitutes a default, which fully protects the Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(i)    The Enterprise requires that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise knew would be breached from day one.

## FACTS SPECIFIC TO PLAINTIFFS

### A.    The Loan

83.    Plaintiffs are a series of related corporate entities that provide vital education, support, and therapy for thousands of children and their loved ones across the Tri-State area, as well as thousands of children in Arizona, particularly children with autism, special needs, and victims of trauma.

84.    YIC alone employs approximately 600 employees and/or vendors. YIC staff features hand-picked special education teachers, related service providers and paraprofessionals.

85.    YIC offers curricular materials, social skills groups, professional development, and other such services.  It views its work for children as a holistic approach to qualitative therapy.  YIC views this process through the eyes of a child and the heart of a parent.  YIC creates an advocacy team for each student, including a site supervisor, experienced special education teacher and third-party consultants.  With services based out of the school's resource room, YIC's trained professionals remediate academic and social teachings via one-on-one sessions.  Because YIC's primary goal is the eventual mainstreaming of each child, YIC remains committed to that goal throughout the intervention phases.  YIC monitors the progress via staff

supervision and remains committed to you via parent training seminars. YIC also facilitates representation at Impartial Hearing or Mediation Sessions regarding a child's IEP or IESP, including coordination with legal representatives.

86.     TRIUMPH is an ABA Therapy provider serving children and young adults with autism.  TRIUMPH employs approximately 1,100 employees and/or vendors.

87.     TRIUMPH'S team maps out custom-tailored regimens aimed to reveal the potential within each child.  These scientifically-backed methods are enhanced by TRIUMPH's internal network of BCBA's, BT's, and clinicians who work cohesively for the benefit of the children under TRIUMPH's care.  TRIUMPH provides services in the comfort of the child's home, contributing with parent training and hands-on experiences.  With services provided during dressing, feeding, and self-care, TRIUMPH aims to influence personalized milestones with professional results.  Triumph also offers a state-of-the-art treatment center, where each child's BCBA assigns a one-on-one curriculum, including progress ratings and reports for documented results.  Triumph also offers treatment services within school settings to further initiate progress, while monitoring and implementing specialized techniques during crucial developmental hours and interaction with peers.

88.     ZAREPHATH operates in Arizona, and provides care for children who have been the victims of trauma.  ZAREPHATH employees approximately 250 employees and/or vendors.

89.     Specifically, Zarephath aims to treat children who have experienced trauma in their lives with the use of a specialized treatment called, "Trauma-Focused, Cognitive Behavioral Therapy" (TF-CBT). Many children who have suffered trauma in their lives experience symptoms that are dangerous to themselves or their loved ones. TF-CBT is typical to 12–24-week treatment, which focuses on addressing the symptoms of trauma, including anxiety, post-

traumatic stress disorder, anger, sexual abuse and depression. Parent or caregiver participation and support is necessary to create a sense of safety and engagement.  The Zarephath Life Skills program provides services to youth between the ages of 8-17 and emphasizes the strengths, interests and talents of each youth involved. ZAREPHATH's Life Skills program is based on two social competency models developed by Teen Challenge and Casey Family Programs and utilizes a research-based curriculum to remediate skills in multiple areas, including: community integration, finance management, educational improvement, social skill building, character development, healthy life choices and family support.  ZAREPHATH employs trained clinicians who complete individualized treatment plans tailored to meet each child and family's unique behavioral health needs. Zarephath's clinicians focus on client and family driven care where treatment plans are structured around each family's strengths and needs.  Length of treatment at Zarephath varies depending on each child and family, and their individual treatment plan. Services take place in Zarephath's office or in a community-based location, such as the child's home or school.

90.     The other corporate Plaintiffs are associated entities of these three businesses.

91.     Plaintiff SIMCHA FELLER is an owner and principal of all of these entities.

92.     GREEN TREE and its agents and associates prey upon cash-strapped businesses that cannot readily obtain financing from banks and other traditional lenders. Toward that end, Defendants market, underwrite and collect upon their loans, which are disguised as MCA transactions with interest rates far above those permissible under New York Law, both civil and criminal.

93.     In early 2024, YIC sought a loan for $2,000,000.00 to fund its operations.

94.     YIC received a solicitation from an agent/representative of GREEN TREE named

"Abe," who after speaking with YIC advised that such a "loan" could be arranged.

95.    Thereafter, GREEN TREE and YIC entered into an MCA Agreement on March 8, 2024.

96.    At all times both parties understood this transaction to be a loan.

97.    However, GREEN TREE, knowing that such a loan was criminally usurious and unenforceable, instead couched the loan in a "merchant cash advance's" clothing.

98.    On its face, the agreement provided YIC an advance of $2,500,000.00 ("Purchase Price") in exchange for the purported purchase of all of Plaintiff's future receipts (the "Future Receipts") until such time as the amount of $3,749,999.00 (the "Purchased Amount") was repaid.

99.    However, in fact, GREEN TREE only sent YIC $2,000,000.00, keeping $500,000 as alleged underwriting and origination fees, even though GREEN TREE had little to no underwriting or origination fees.[21]

100.    Additionally, on its face, the agreement provided that the Purchased Amount was to be repaid through daily ACH withdrawal in the amount of $62,500.00 (a "Daily Payment"), which would result in the amount being repaid in just 60 days which, on its face, translates to an annual interest rate of 525% per annum or 21 times the maximum 25% rate permitted under New York's criminal law.

---

[21] The New York Court of Appeals in <u>Adar Bays, LLC v. GeneSys ID, Inc.</u>, 37 NY3d 320, 337 (2021) instructed that criminal usury analysis requires "strict attention to additional fees exacted sometimes creatively through loan instruments" and that New York law requires that all consideration to be paid in exchange for a loan should be valued when determining if a transaction is usurious; where the object of the parties is a loan of money, and something else under the form of an exchange or sale is substituted for it, the principle of the loan, and consequently of the debt contracted by the nominal vendee, will be the value in money of the substitute received by him; and any consideration paid or secured to the vendor beyond that will in general be considered as interest for its forbearance. Thus, these alleged upfront fees charged or other costs imposed were clearly additional interest profit on what was in actuality a $2 million dollar loan, and as such, are properly considered interest and not principal.

101.    The fixed daily payment was disguised as an alleged "good-faith estimate" equal to 45% of YIC's daily revenues. The estimated daily payment did not remotely reflect 45% of YIC's daily revenues. Rather, the estimated daily amount was dictated by Defendant based on Defendant's desired length of the payment term of the loan. i.e. 60 days.

102.    Similar to what might be required in a loan, and completely inappropriate for a "sale of future receivables," GREEN TREE also required FELLER to execute a personal guaranty and an Affidavit of Confession of Judgment, as well as a blanket security interest in all of their assets.

103.    The MCA Agreement was an unconscionable contract of adhesion that was not negotiated at arms-length. Instead, it, as well as other such agreements entered into by Green Tree, contained the typical MCA one-sided terms that prey upon the desperation of businesses and their individual owners and help conceal the fact that the transactions, including the ones involving YIC, are really loans.

104.    Among these one-sided terms, the MCA Agreement included: (1) a provision giving Green Tree the irrevocable right, through a "power of attorney," to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name (*see* MCA Agreement, ¶ 1.12), (2) a provision preventing the merchant from transferring its assets (*see id.* ¶ 3.1(f)), (3) selling the business without permission from Green Tree (*see id.* ¶ 3.1(f)), (4) a one-sided attorneys' fees provision obligating the merchant to pay Green Tree's attorneys' fees but not the other way around (*see id.* ¶¶ 1.13, 3.4), (5) requiring the merchant to execute a confession of judgment for Green Tree's full repayment amount, (6) a personal guarantee (*see id.* page 6), (7) a jury trial waiver (*see id.* ¶ 4.10), (8) a class action waiver (*see id.* ¶ 4.11), (9) a collateral and security agreement providing a UCC lien over all of

the merchant's assets (*see id.* page 6), (10) a prohibition of obtaining financing from other

sources (*see id.* ¶ 3.1(i)) and (11) a power-of-attorney authorizing Green Tree "to take any action

or execute any instrument or document to settle all obligations due…."

105.    Additionally, although the agreement nominally contained a "reconciliation"

provision, the provision was a sham.

106.    For example, GREEN TREE conditioned granting reconciliation on YIC

providing any and all documents that GREEN TREE might request; YIC's failure to provide

every document that GREEN TREE could possibly request provided Green Tree with a complete

basis to deny the reconciliation regardless of changes to YIC's receivables. *See* MCA

Agreement, ¶ 1.4.

107.    Additionally, GREEN TREE would only be obligated to reconcile once a month,

and only if YIC wasn't in default.  Practically speaking, if YIC was at the point where it required

a reconciliation, it would be nearly impossible not to already be in default, thereby precluding

GREEN TREE from having to reconcile and allowing it to declare the entire sum due and owing.

108.    Courts have construed such conditions in MCA agreements as rendering the

reconciliation provisions illusory such that they are actually loans. *See, e.g., Haymount Urgent

Care PC v. Go Fund Advance, LLC*, 609 F. Supp. 3d 237, 248-49 (S.D.N.Y. 2022) (finding

MCA agreements like loans where "while the reconciliation provision purports to be

'mandatory,' its structure nonetheless vests substantial discretion in [MCA lender] to deny

reconciliation: the reconciliation provision expressly permits the lender 'to request additional

documentation . . . and notes that 'refusal to provide access shall be a breach' such that the

lender 'shall have no obligation to reconcile. It is readily apparent how the lender could use this

contractual right to obtain from the merchant further documentation as a procedural pretext for

denying reconciliation'"); *Lateral Recovery LLC v. Queen Funding, LLC*, 21 Civ. 9607 (LGS),

2022 U.S. Dist. LEXIS 129032, at *15 (finding reconciliation provision in an MCA agreement

illusory where it provides "'if the Merchant fails to furnish the requested documentation within

five (5) business days following the end of a calendar month, then Queen Funding shall not

effectual the reconciliation"); *Lateral Recover, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d

402, 461 (S.D.N.Y. 2022) ("CMS") ("It is thus also plausible to read the reconciliation provision

as being virtually illusory. In the first place, the provision is contingent upon the merchant

producing satisfactory documentation to the funder providing the funder a ready means to deny

reconciliation"); *AKF, Inc. v. W. Foot & Ankle Ctr.*, 632 F. Supp. 3d 66, 77 (E.D.N.Y. 2022)

(similar); *McNider Mar., LLC v. Yellowstone Capital, LLC*, 2019 NY Slip Op 33418(U), at *9

(Sup. Ct. Nov. 19, 2019) (similar).

109.     In addition, the MCA Agreement provides that GREEN TREE would perform the

requested reconciliation—to the extent granted—within five business days, which was an

intentional ploy to prevent YIC, or any merchant for that matter, from utilizing reconciliation

because missed daily payments would constitute an event of default under the MCA Agreement.

(*See* MCA Agreement, ¶¶ 1.4, 3.1), thereby rendering GREEN TREE entitled to enforce the

entire debt, and invalidating any other avenue of relief that YIC might otherwise have (for

example, being in default, a bankruptcy filing would not relieve YIC of the amounts owed).

110.     Given that the MCA Agreement's reconciliation provision provided that

"[n]othing set forth in this section shall be deemed to provide Merchant with the right to interfere

with [Green Tree's] right and ability to debit Merchant's Account while the Request is pending

or to unilaterally modify the Remittance Amount" (*id.,* ¶ 1.4), GREEN TREE designed its

reconciliation provision to be effectively impossible for a merchant to use because it would be

placed in default if it missed the fixed payments while its reconciliation request was still pending—which is certain since a merchant can only request reconciliation where it is experiencing a slowdown in projected revenue—and being in default voids the merchant's right to reconciliation. *Id*.

111.    Courts have found such reconciliation provisions that would put the merchant in default before reconciliation would be performed based on missed payments to be illusory and render the MCA agreements being loans. *See CMS*, at 456-57. 28.

112.    The fact that the MCA Agreement would place YIC in default for simply missing a fixed daily payment over the course of the MCA Agreement's term renders it a loan. In fact, numerous courts have ruled less onerous default provisions render MCA agreements loans. *See CMS*, at 458 (finding MCA agreement like a loan where the "merchant has to pay a fixed amount on a daily basis. If it fails to do so just three times, a default is declared"); *Davis v. Richmond Capital Group*, 194 A.D.3d 516, 517 (1st Dep't 2021) (finding MCA agreements like a loan where there were "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default"); *Queen Funding*, at *18 (finding MCA agreements loans where "an 'Event of Default' occurs is 'attempted ACH debit of the Specific Daily Amount is rejected two times during the term"); *People v. Richmond Capital Group LLC*, 451368/2020, 2023 NYLJ LEXIS 2487, *7-8 (Sup. Ct. Sept. 20, 2023) (finding MCA agreements to be loans where default would occur after three missed payments).

113.    Finally, upon information and belief, GREEN TREE does not have a reconciliation department and does not perform reconciliations, and did not perform any reconciliations here.

114.    In these and other ways, Defendants used a sham reconciliation provision in the

MCA Agreement to disguise the Loan as a purported merchant cash advance.

115.     Additionally, the MCA Agreement also contained a *de facto* fixed term of 60 days, easily calculated by dividing the amount Plaintiffs owed by the amount of the daily payments, and a failure to pay would not indefinitely extend the term because the agreement provides that a default would occur if any terms of the agreement were breached or if a single payment was not made during the term of the agreement and YIC did not contact Defendants in advance, whereupon Defendants would have the right to exercise all remedies in connection with the agreement, including accelerating the debt and collect the entire amount owed, enforcing its security interest in the collateral, and enforcing the guarantee.

116.     Additionally, Defendants had full recourse in bankruptcy, as the agreement did not provide that a slowdown in business or bankruptcy would excuse payments, but rather said that "Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, **in and of itself**, does not constitute a breach of this Agreement." (emphasis added).  However, as full payment of the purchase price would be due immediately under a number of conditions, including any violation of any term of the agreement, and the personal guaranty explicitly states that the individual guarantor would owe all amounts should there be a bankruptcy by the corporate bower effectively shielding the lender from the risk of loss when the creditor is nearly or actually bankrupt, and thus Defendants would bear nearly no risk of the receivables' non-performance and would recover the Purchased Amount even if the receivables turned out to be uncollectable.

117.     Similarly, Defendants bore no real transfer of risk because the repayment and remedy terms of the agreements shielded Defendants from the risk that the purchased receivables may be uncollectable, since if the specified daily amount was rejected even one time and YIC

did not contact Defendants in advance of the ACH debit being rejected, payment would become immediately due and Defendants would be allowed to foreclose on the collateral, including any collateral held by the guarantor.

118.    Additionally, despite its documented form, the transaction between Green Tree and YIC was, in economic reality, a Loan that is absolutely repayable. Among other hallmarks of a loan are those set forth below:

(a)    The daily payments required by the MCA Agreement were fixed and the so-called reconciliation provisions were mere subterfuge to avoid this state's usury laws. Rather, just like any other loans, the purchased amounts were to be repaid within a specified time;

(b)    The default and remedy provisions purported to hold YIC absolutely liable for repayment of the purchased amounts;

(c)    While the MCA Agreement purported to "assign" all of YIC's future account receivables to Green Tree until the purchased amount was paid, YIC retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, Green Tree merely acquired a security interest in all of YIC's assets to secure payment of the purchased amount;

(d)    The MCA Agreement does not identify specific receivables of YIC that Green Tree purportedly purchased, and it was YIC—not Green Tree—that was responsible for collecting receivables Green Tree allegedly purchased. This feature in MCA agreements has been found by courts to render them loans. *See Haymount*, at 249 ("***Nor does any MCA agreement identify particular revenues or accounts that*** *were supposedly purchased, so there is no transfer of 'risk of nonpayment by any specific customer. Moreover, the MCA agreements leave merchants with the responsibility to collect revenues from all their accounts*") (emphasis added);

(e)    Unlike true receivable purchase transactions, the MCA Agreement was underwritten based upon an assessment of the YIC's credit worthiness – not the creditworthiness of any account debtor;

(f)    The purchased amount was not calculated based upon the fair market value of the YIC's future receivables, but rather was unilaterally

dictated by Green Tree based upon the interest rate it wanted to be paid. Indeed, as part of the underwriting process, Green Tree did not request any information concerning the YIC's account debtors upon which to make a fair market determination of their value;

(g)     The amount of the daily payments were determined based upon what Green Tree wanted to be paid, and not based upon any good-faith estimate of the YIC's future account receivables;

(h)     Green Tree assumed no risk of loss if YIC failed to generate sufficient receivables, because the failure to maintain sufficient funds in the designated account Green Tree took ACH debits from constituted a default under the MCA Agreement;

(i)     Green Tree required that YIC undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protected Green Tree from any risk of loss resulting from YIC's failure to generate and collect receivables.

(j)     Green Tree required that YIC grant it a security interest in all of its receivables and other intangibles and, further required that the individual owner, Mr. Feller (and other family members), personally guarantee the performance of the representations, warranties and covenants of YIC.

119.    Thus, the transaction was clearly a loan and not a legitimate merchant cash advance.

120.    From March 8, 2024 until April 10, 2024 – i.e., a period of only thirty-three calendar days and less than five weeks' time – YIC paid back GREEN TREE $937,500.00 in criminally usurious interest in the form of the following ACH payments and wire transfers:

| | | |
|---|---|---|
| 3/11/2024 | $62,500 | ACH |
| 3/12/2024 | $62,500 | ACH |
| 3/13/2024 | $62,500 | ACH |
| 3/14/2024 | $62,500 | ACH |
| 3/15/2024 | $62,500 | ACH |
| 3/18/2024 | $62,500 | ACH |
| 3/19/2024 | $62,500 | ACH |

| 3/20/2024 | $62,500 | ACH |
| 3/21/2024 | $62,500 | ACH |
| 3/26/2024 | $62,500 | Wire |
| 3/27/2024 | $62,500 | Wire |
| 3/28/2024 | $62,500 | Wire |
| 4/2/2024 | $62,500 | Wire |
| 4/3/2024 | $62,500 | Wire |
| 4/9/2024 | $62,500 | Wire |

121.    Yet, notwithstanding this stream of payments, GREEN TREE unilaterally asserted that YIC had defaulted under the MCA Agreement, and on April 15, 2024, GREEN TREE, through Defendant BERKOVITCH & BOUSKILA, PLLC (and specifically, Defendant BOUSKILA as the attorney of record) applied – without any notice or warning to Plaintiffs – for the entry of judgment against Plaintiffs, and thereby commenced an action entitled *Green Tree Capital LLC v. Yes I Can Licensed Behavior Analyst PLLC, et al.*, Index No. 510826/2024, and based on the affidavit of confession that Defendant GREEN TREE made Plaintiffs sign as part of the loan process, obtained an automatic Clerk's judgment for more than $3.5 million dollars, which included over $700,000 in purported legal fees for filing an affidavit of confession and clerk's judgment.

122.    The papers submitted by GREEN TREE's "authorized representative" were executed in New York, New York, even though Defendant GREEN TREE is allegedly based in Connecticut.

123.    Shortly after obtaining the Judgment, Defendants went so far as to direct various subpoenas to FELLER's wife and to his attorneys.  Defendants, moreover, commenced a separate action (Supreme Court, Kings County Index Number 511231/2024) seeking to obtain an order directing the sheriff to sell certain real property owned by FELLER and located at 312

Elmwood Ave, Brooklyn, NY.

124.    Defendants also froze Plaintiffs' bank accounts, causing Plaintiffs substantial harm, including the inability to meet their payroll obligations and causing at least $1 million dollars in damages plus millions of dollars in additional damages and lost business thereafter as discussed below.

125.    Plaintiffs moved to stay enforcement of the judgment, and initially got some of the assets unfrozen via a TRO, but ultimately, the case was moved to the Commercial Division and assigned to Supreme Court Justice Boddie, who denied the request for a preliminary injunction.

126.    Plaintiffs appealed the denial of their preliminary injunction to the Appellate Division, Second Department (App. Docket No. 2024-05786), and were granted a TRO by the Appellate Division, staying enforcement of the judgment.

127.    As required under New York law (discussed below) Plaintiffs had also separately filed a plenary action (Supreme Court, Kings County Index No. 5114231/2024) seeking to vacate the judgment on various grounds, and moved for a preliminary injunction in that action as well.

128.    On September 20, 2024, Justice Boddie (who was also assigned to the separate plenary action) granted the motion to the extent that he vacated the judgment in Index No. 510826/2024, holding that the attorney's fees of $700,000 were an unenforceable penalty that voided the judgment.

129.    Plaintiffs now file this action to deal with the federal civil RICO claim that Plaintiffs have against Defendants and their criminal enterprise, and the pendent state law and claims related thereto.

**B.    Defendants' Fraudulent Scheme**.

130.    The Defendants have unlawfully provided and attempted to collect upon usurious loans by way of the sham MCA Agreement.

131.    Defendants have engaged in predatory and fraudulent conduct that has enabled them to attempt to fraudulently extract even more monies from Plaintiffs.

132.    Among other things, Defendants fraudulently induced Plaintiffs to enter into contracts not reflecting the terms agreed upon; Defendants failed to provide the amount promised, and based on their conduct in other similar cases will claim to have fraudulently charged Plaintiffs half a million dollars in so-called "Origination Fees" and "Underwriting Fees" to cover the costs of due diligence that they never performed and "ACH fees" to cover ACH operations they claimed were "labor intensive" but, in actuality, were fully automated and cost a mere fraction of the fees allegedly charged; and Defendants fraudulently claimed over seven hundred thousand dollars in attorney's fees that Defendants knew they did not incur in order to freeze and extort a larger amount of money from Plaintiffs.

### C.    The Involvement of Jonathan Braun, Who Was Under Injunction at The Time of this MCA Agreement.

133.    As discussed further herein, part of the enterprise in this case is Defendant DELAWHO.

134.    Upon information and belief, it is believed that DELAWHO and its six related MCA companies are controlled and manipulated by Jonathan Braun, a notorious criminal, loan shark, and MCA fraudster.

135.    One of the bases for this belief, is that unlike the cases in New York, where Defendant GREEN TREE files affidavits of a gentleman allegedly named "Matthew Stafford" (who upon information and belief lives in Henderson, Nevada, even though he allegedly

executed an affidavit from New York, New York) an inspection of Defendant GREEN TREE's filings in Connecticut Superior Court reveal that Defendant GREEN TREE is allegedly managed by Defendant BEITYAKOV.

136.    Likewise, all or nearly all of the other MCA cases filed by the DELAWHO entities contain affidavits from Defendant BEITYAKOV claiming to be the manager of those entities.

137.    Upon information and belief, Defendant BEITYAKOV is a known BRAUN and WOLF (who himself is a known BRAUN underling/associate/partner) underling who was associated with his other MCA companies.

138.    Likewise, Defendant BEITYAKOV's affidavits are all notarized by a woman named "Breindy Krausz," who upon information and belief is also a BRAUN and WOLF associate who worked for their other MCA companies.

139.    This Court has already determined that BRAUN operated through others, including keeping his money in other's names to try to insulate himself from judgment.  *See FTC v. Braun*, No. 20-cv-4432 (JSR), 2024 U.S. Dist. LEXIS 20535, at *19-20 (S.D.N.Y. Feb. 6, 2024).

140.    Accordingly, it would appear that BRAUN continues to operate these MCA companies from behind the scenes.

141.    If discovery bears out this belief, then that would mean that the entire transaction here was unlawful and barred by two separate injunctions.

142.    First, as mentioned above, on September 27, 2023, this Court entered a permanent injunction permanently banning BRAUN from any involvement with the merchant cash advance industry, including assisting anyone else in offering those services, and permanently banning

BRAUN from the debt collection industry. *See FTC v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 396-97 (S.D.N.Y. 2023).

143.    Second, on September 20, 2023, the New York Supreme Court, New York County, likewise issued a permanent injunction in *People of the State of New York, by Letitia James, Attorney General of the State of New York v. Richmond Capital Group LLC, et al*, Index No. 451368/2020 prohibiting BRAUN and any of his associates from engaging in MCA activity.

144.    More specifically, in an action entitled *People of the State of New York, by Letitia James, Attorney  General of the State of New York v. Richmond Capital Group LLC, et al.*, Index No. 451368/2020 (the "NY AG Action"), the Supreme Court entered,  among other things, a Decision and Order dated September 20, 2023 (the "9/20/23 Order"). *See  People v. Richmond Capital Group LLC*, 451368/2020, 2023 NYLJ LEXIS 2487 (Sup. Ct. NY Cty Sept. 20, 2023).

145.    By its 9/20/23 Order, the Court in the NY AG Action held, among other things, as follows:

> As discussed more specifically below, ***on the record before the Court, the NY AG has demonstrated that the Predatory Lenders are loan sharks who perpetrated a massive fraud on desperate merchants (the Borrowers) who were unable to obtain traditional financing for their businesses***. The record includes (i) over 140 sample merchant cash advance agreements (each an MCA, and together collectively, the MCAs; each of which MCA contains materially the same terms as the other MCAs), (ii) the business records of Actum Processing LLC (the loan payment processing company; hereinafter, Actum), (iii) certain admissions from the individual Predatory Lenders, (iv) affidavits of certain of the individual Predatory Lenders (which affidavits were submitted at the direction of, or in concert with, other individual Predatory Lenders and without legitimate purpose and in furtherance of the fraud perpetrated by these Predatory Lenders [which affidavits are flatly contradicted by email admissions of the same individuals and other documentary evidence in the record]), and (v) certain affidavits of the Borrowers. ***The Predatory Lenders, acting in concert with each other (and, for a significant period of time, in fact, working out of the same physical office space right next to each other on the same transactions despite purportedly being part of different***

> ***companies), also submitted false documents without legitimate purpose to various***
> ***courts in furtherance of their illicit operation.***

9/20/23 Order, 2023 NYLJ LEXIS 2487 at * 4-5 (emphasis added).

146.    By its 9/20/23Order, the Court in the NY AG Action further held, among other

things, as follows:

> ***There are no issues of fact that the MCAs were loans, not a legitimate purchase***
> ***of accounts receivables (Blue Wolf Capital Fund II, L.P. v. American***
> ***Stevedoring, Inc., 105 AD3d 178, 182-183 [1st Dept 2013]). The Predatory***
> ***Lenders made no secret of this.*** They advertised themselves as lenders making
> small business loans where "[m]ost loans are completed and money your business
> account within 48 hours" (NYSCEF Doc. No. 27, at 5). Indeed, according to Ram,
> "[a]s a private lender, Ram Capital Funding takes pride in investing in projects
> that traditional banks may deny or may take months to approve..." (NYSCEF Doc.
> No. 28, at 2). Indeed, the risk of loss associated with ownership of the Borrower's
> account receivable never passed to the Predatory Lenders. ***Pursuant to the MCAs,***
> ***the Borrowers were required to send bank statements to the Predatory Lenders***
> (see, e.g., NYSCEF Doc. No. 9, at 1). Although the MCAs provided for mandatory
> reconciliation of the daily amounts collected with the amounts of accounts
> receivable actually received by the Borrowers following receipt of such bank
> statements as if the transactions were sale transactions ***this was a total sham*** (id.).

9/20/23 Order, 2023 NYLJ LEXIS 2487 at * 5-6 (emphasis added).

147.    By its 9/20/23 Order, the Court in the NY AG Action further held, among other

things, as follows:

> ***There are no issues of fact that these Loans were usurious. Indeed, in one case***
> ***interest of over 3000 percent was charged (NYSCEF Doc. No. 108). There is no***
> ***evidence in the record that any of the massive fees charged were legitimate, such***
> ***that these fees must be characterized as interest (which fees and other upfront***
> ***costs the Predatory Lenders had falsely advertised did not exist). But even if the***
> ***fees and upfront costs were not recharacterized as interest (as they should be),***
> ***these Loans were criminally usurious by charging interest at a rate far above the***
> ***legal limit.***

9/20/23 Order, 2023 NYLJ LEXIS 2487 at * 8-9 (emphasis added).

148.    By its 9/20/23 Order, the Court in the NY AG Action further held, among other

things, as follows:

*There are no issues of fact that the Predatory Lenders engaged in fraudulent and illicit conduct in violation of New York State law.* Although the Predatory Lenders' advertising leaves no doubt that they were lenders, not all of their advertising was true. By way of example, to entice would-be Borrowers to do "business" with them, they indicated that there were "no application fees" and "no upfront costs" (NYSCEF Doc. No. 27, at 3). As indicated above, this was false. *The Addendum to the MCAs sets forth a comprehensive fee schedule. In addition, the amount actually funded to the Borrowers was not the full amount that was "purchased." It was also false that there would be a daily sweep of the pledged accounts based on an estimated percentage of collected receivables the so-called "Specified Percentage." The MCAs required the Borrowers to deliver bank statements by the eighteenth of every month, and the merchants were required to perform a reconciliation of the amounts collected based on an estimated percentage of accounts receivable and the amounts of accounts receivable actually received (see, e.g., NYSCEF Doc. No. 9, at 1). Monthly reconciliation never occurred.*

9/20/23 Order, 2023 NYLJ LEXIS 2487 at * 9-10 (emphasis added).

      149.    By its 9/20/23 Order, the Court in the NY AG Action further held, among other things, as follows:

*The massive fraud perpetrated by the Lenders also included submitting false affidavits to courts in support of Confessions of Judgments that they filed upon a Borrower default based on non-payment. There are no issues of fact as to whether the affidavits were perjurious or done without legitimate purpose.* To wit, these affidavits, filed by Messrs. Reich and Giardina and Ms. Gregg, and *at the direction of Mr. Braun, knowingly contained false statements about the MCAs, Security Agreements and Guaranties (collectively, the Loan Documents) so that the Predatory Lenders could obtain judgments and collect amounts to which they had no legal right of entitlement as such funds were criminally usurious interest amounts or otherwise fraudulently obtained fees.* Among other things, in these perjurious affidavits, the Predatory Lenders falsely claimed that the Borrowers had made payments based on the "Specified Percentage" set forth in the Loan Documents. They had not. *The Predatory Lenders had made daily sweeps where these daily sweep payments were not based on a percentage of receivables i.e., the "Specified Percentage" and where no attempt was made (as required) to reconcile such daily sweeps to ensure that amounts debited from the Borrowers accounts were based on the collected accounts receivable.*

9/20/23 Order, 2023 NYLJ LEXIS 2487 at * 12-13 (emphasis added).

      150.    On the basis of these and other holdings, the Court in the NY AG case directed and ordered, among other things, as follows:

"ADJUDGED, ORDERED, and DECREED *that the Predatory Lenders are permanently enjoined from engaging in the fraudulent and illegal practices set forth in the amended petition;* and it is further

ADJUDGED, ORDERED, and DECREED *that the Predatory Lenders shall cease all collection of payment or other monies related to the MCAs*; and it is further

ADJUDGED, ORDERED, and DECREED *that any agreement entered into between the Predatory Lenders and any merchant in connection with an MCA, including each Merchant Agreement, Security Agreement and Guaranty, Authorization for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Appendix A: The Fee Structure, Addendum to Secured Purchase and Sale of Future Receivables Agreement, and form providing the Predatory Lenders with access to the merchants' bank accounts is rescinded*; and it is further

ADJUDGED, ORDERED, and DECREED *that the Predatory Lenders shall promptly apply for vacatur of all confessions of judgment filed by them and all judgment issued in their favor based on such filings by all courts of this State that have issued such judgments within 60 days of this Decision and Order and provide evidence of the same to the NY AG at their sole cost and expense."*

151.    Accordingly, should discovery confirm that Defendant BRAUN was the one actually running Defendant GREEN TREE, whether directly or indirectly, or was otherwise in any way involved, then the MCA loan in this case was a legal nullity as being in violation of both this Court's permanent injunction, as well as the Supreme Court's order and decree.

## FIRST CAUSE OF ACTION
### (RICO: 18 U.S.C. § 1962)

152.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

**A.    The Unlawful Activity.**

153.    "Racketeering activity" for purposes of RICO, includes any act indictable under various specified federal statutes, including the mail and wire fraud statutes, as well as the collection of unlawful debt.

154.    The essential elements of mail and wire fraud are (1) a scheme to defraud, (2)

money or property as the object of the scheme, and (3) use of interstate mails or wires to further the scheme.

155.    The agreement at issue here contained numerous false statements, including but not limited to the statements that: a) the transaction is not a loan; b) the daily payment was a good-faith estimate of the merchant's receivables; c) the underwriting and origination fee represented the alleged costs for Defendants' due diligence and other costs in performing its analysis for this financing transaction.

156.    These statements were false.

157.    First, the transactions were loans because, notwithstanding the (sham) reconciliation provision, the agreements required fixed daily payments, a security interest in all of Plaintiffs' receivables, and the personal guarantee of the corporate and individual Plaintiffs, and moreover because the agreements relied on the creditworthiness of Plaintiffs rather than its customers who owed the receivables.

158.    Second, that the required daily payments represented a specified percentage of a good-faith estimate of Plaintiffs' daily receivables purchased was clearly not true, and was instead the standard percentage of 45% that Defendants use in all of their agreements even though the amount of the daily payments varies with the size of the loan.  Rather it is clear that Defendants merely select this alleged "good faith estimate" based on the size of the loan that they are giving out.

159.    Third, while the Origination Fee purportedly related to the costs of due diligence Defendants performed little or no due diligence and did not incur these costs or anything close to them.  Similarly, there were no underwriting fees, notwithstanding the statement in the Agreement to the contrary.

160.     Defendants also engaged in the use of interstate wires to further their scheme, and Defendants used interstate emails to originate, underwrite, service and collect upon the Agreements, which contained the false statements.

161.     Defendants' offices are allegedly located in Connecticut, while the personnel used to effectuate the scheme described herein are located in New York.  Accordingly, Defendants necessarily used interstate mails/wires for interstate transactions.

162.     Defendants also collected the amounts allegedly due under the Agreement via interstate electronic ACH debits.

163.     These fifteen ACH debits and wires, which Defendants collected over the course of two months and would have continued to collect, were Defendants' regular means of collecting on their MCA agreements.

164.     These fraudulent MCA agreements and practices of Defendants (including but not limited to the oppressive litigation tactics against merchants upon their alleged default described above) were not limited to Plaintiffs, but rather were part of Defendants' regular way of operating their business and criminal Enterprise.

165.     Additionally, Defendants committed unlawful racketeering activity through their collection of unlawful debt.

166.     In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

167.     As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity

statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

168.   As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

169.   This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

170.   As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

171.   The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

172.   Like here, this was a purely artificial device used by the loan-shark to evade the law—an evasion that the Legislature sought to prevent.

173.   Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

174.   New York has set its limit at 16% for civil usury, and 25% for criminal usury.

175.   General Obligations Law § 5-501(2) prohibits any person from charging, taking, or receiving any money as interest on a loan at a rate exceeding the maximum permissible interest rate. *See Roopchand v Mohammed*, 154 A.D.3d 986, 988, 62 N.Y.S.3d 514 (2d Dep't 2017). "The maximum per annum interest rate for a loan or forbearance of money is 16% under New York's civil usury statute and 25% under the state's criminal usury statutes." *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 182, 961 N.Y.S.2d 86, 89 (1st

Dep't 2013); *see also* General Obligations Law § 5-501(1); Banking Law § 14-a(1).

176.    Where a note is usurious in violation of law, it is void and unenforceable. *See Bakhash v Winston*, 134 A.D.3d 468, 469, 19 N.Y.S.3d 887 (1st Dept 2015). "A usurious contract is void and relieves the borrower of the obligation to repay principal and interest thereon." *Roopchand*, 154 A.D.3d at 988 (internal quotations marks omitted); *see also* General Obligations Law § 5-511; *Abraham v American Gardens Co.*, 189 A.D.3d 741, 744, 136 N.Y.S.3d 148 (2d Dep't 2020).

177.    To determine whether a transaction is usurious, courts look not to its form but to its substance or real character." *Blue Wolf Capital Fund II*, 105 A.D.3d at 182, 961 N.Y.S.2d at 89.

178.    Here, the MCA Agreement clearly provided for interest at a rate that far exceeds the statutory maximum for loans in the State of New York. *See Adler v. Marzario*, 2021 N.Y. App. Div. LEXIS 7037, *2 (2d Dep't December 15, 2021) ("Here, the loan agreement is usurious on its face, and thus the loan and mortgage are void on the ground of usury, as a matter of law"). "If usury can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law." *Fareri v Rain's Int'l, Ltd.*, 187 A.D.2d 481, 482, 589 N.Y.S.2d 579 (2d Dep't 1992); *see also Shabat v. Schnaier*, 2020 N.Y. Misc. LEXIS 10591 *4 (N.Y. Co. December 10, 2020) ("The discrepancy between the amount advanced and the amount payable is prima facie evidence of usury").

179.    The Defendants violated civil RICO by collecting upon unlawful debt, as well as by committing wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

180.    The Defendants also committed the interstate transportation of money obtained by

fraud in violation of 18 U.S.C. §2314.

181.    Defendants fraudulently induced Plaintiffs to enter into the MCA agreement at issue by misrepresenting the amount of the loan, but then charging $500,000 in sham fees, which Defendants fraudulently charged and converted.  This fee was fraudulent as it was simply a ploy to extract additional funds from the Plaintiffs and did not actually comprise real expenses pertaining to origination or underwriting. None of these fees had any relationship to any services actually rendered and instead were disguised interest charges.  GREEN TREE knew that its representations concerning the nature and purpose of these fees was false and misleading at the time it entered into the MCA agreement.

182.    Defendants also knew that the payments that they were taking on a daily basis were criminally usurious, illegal interest payments.

183.    Additionally, Defendants BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC participated in the fraud by collecting upon this illegal debt and filing papers in state court asserting grossly inflated attorney's fees in order to freeze and extort a larger sum from Plaintiffs.

184.    The actions of Defendants BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC on behalf of the Enterprise were not limited to Plaintiffs.

185.    Rather, Defendants BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC are integral parts of the Enterprise, being the attorneys that upon information and belief are now used exclusively by the Enterprise to enforce and collect upon the Enterprise's unlawful debt.

186.    Based on publicly available court filings, it would appear that Defendants BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC have been involved in

18 recent cases on behalf of the Enterprise in Connecticut, and 2 additional cases in New York, including this case with Plaintiffs.

**B.    Culpable Persons.**

187.    Defendants BRAUN, WOLF, BEITYAKOV, BOUSKILA, BERKOVITCH, John Does 1-10, and John Doe Investors 1-10 are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is an individual capable of holding a legal interest in property.

**C.    The Enterprise.**

188.    Defendant DELAWHO and the six entities through which it operates, including Defendant GREEN TREE, constitute an Enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  This Enterprise is run and controlled by its principals, to wit: upon information and belief, Defendants BRAUN, WOLF, BEITYAKOV, and/or John Does 1-10.

189.    Upon information and belief, DELAWHO does not operate any business of its own.

190.    Instead, DELAWHO, a Delaware limited liability company that was formed in 2022 around the same time as GREEN TREE, is upon information and belief, the entity that was created to run an Enterprise affiliated with a total six Connecticut-domiciled entities, all formed in November 2022, as follows: (i) PJR Advance LLC (Connecticut (US), 11 Nov 2022); (ii) Green Tree Capital LLC (Connecticut (US), 21 Nov 2022); (iii) Flip Funding LLC (Connecticut (US), 21 Nov 2022); (iv) Uptop Financial LLC (Connecticut (US), 11 Nov 2022); (v) Lion Business Funding LLC (Connecticut (US), 21 Nov 2022); and (vi) Ash Capital LLC (Connecticut (US), 21 Nov 2022).

191.    The principals of DELAWHO (who are also the principals of these other entities), decide which of their various fraudulent MCA companies they will use for which loans.

192.    The Enterprise is associated in fact for the common purpose of carrying on an ongoing unlawful enterprise. Specifically, the Enterprise has a goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at many multiples above the enforceable rate under the laws of New York and other states.

193.    Since at least 2022 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

194.    Upon information and belief, DELAWHO and its entities have issues hundreds of MCA loans to companies all over the United States, and in the less than two years since their formation, have already initiated litigation and collection on more than 70 of them.

195.    The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable usury statutes and (ii) the rates are many multiples higher than the legal rate permitted under New York Penal Law §190.40.

196.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements containing fraudulent clauses and relating to and for the purpose of collecting upon fraudulent fees and usurious interest through electronic wires.

197.    Additionally, the Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise

constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

198.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of transporting fraudulently-obtained money interstate.

199.    Additionally, the Enterprise's conduct constitutes interstate transportation of stolen property within the meaning of 18 U.S.C. 2314, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**D.    The Roles of the RICO Persons in Operating the Enterprise, and the roles of the individual companies within the Enterprise.**

200.    The RICO Persons have organized themselves and each Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

201.    Upon information and belief, BRAUN, WOLF, and/or additional John Does 1-10 are the principals of the Enterprise. They are responsible for the day-to-day operations of the Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, which LLC will be used as the funding entity, how such loans will be funded, which of the John Doe Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

202.    In their capacity as the principals, BRAUN, WOLF, and/or additional John Does 1-10 are responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) the method and form used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations. All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to Plaintiffs.

203.    BRAUN, WOLF, and/or additional John Does 1-10 have taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

204.    Upon information and belief, Defendant BEITYAKOV is the named principal on paper for the enterprise, and she is the one that executes the directions of BRAUN, WOLF, and/or the additional John Does 1-10.  She is also the one that signs all or almost all of the affidavits necessary for the Enterprise to enforce and collect upon its unlawful loans and agreements.

205.    Upon information and belief, Defendant STAFFORD is the individual that the Defendants have begun using to play a similar role to that of Defendant BEITYAKOV.

206.    Defendant STAFFORD played such a role as it relates specifically to Plaintiffs' account.

207.    Upon information and belief, BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC are the new attorneys that the other Defendants now use to unlawfully freeze and levy against victims' bank accounts and other assets, fraudulently induce "settlement" agreements and releases, and collect upon the unlawful loans.  They play an integral role in the Enterprise, as without their part, the Enterprise would not be able to enforce and collect upon its unlawful Debt.  Their actions on behalf of the Enterprise include but are not limited to the filing of repetitive lawsuits carrying the hallmark of insubstantial claims, and thus sham litigations. This can be demonstrated by the fact that of the 71 actions filed by the various Enterprise entities, 66 of them, or 93%, resulted in a default judgment with no appearance by the defendants.  BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC would have known this upon a review of the filings.  Of the 19 actions filed by BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC other than this one, **all 19 of them** resulted in default judgments with no appearance by the defendants.  Thus BOUSKILA, BERKOVITCH, and BERKOVITCH & BOUSKILA, PLLC know or should know that they are engaged in sham litigation on behalf of the Enterprise.

208.    All of the Culpable Persons have ultimately benefited from the Enterprise's unlawful collection and funneling of the usurious loan proceeds to the other Enterprise members.

209.    BRAUN, WOLF, BEITYAKOV, and/or the additional John Does 1-10 have operated GREEN TREE together with the related Enterprise companies as part of an unlawful enterprise to collect upon unlawful debt, commit wire fraud, and cause the interstate transportation of money obtained through fraud. Pursuant to its membership in the Enterprise, GREEN TREE has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with the John Doe Investors to fund the

usurious loans; (ii) pooled the funds of the John Doe Investors in order to fund each usurious

loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest

to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of

the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH

withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments

in its name to further collect upon the unlawful debt.

210.    The John Doe Investors are a group of organizations and individual investors who

maintain separate officers, books, records, and bank accounts independent of the other Enterprise

Members.

211.    Directly and through their members, agent officers, and/or employees, the John

Doe Investors have been and continue to be responsible for providing GREEN TREE and the

other Enterprise entities with all or a portion of the pooled funds necessary to fund the usurious

loans, including the Agreement at issue in this case, and to approve and ratify the Enterprise's

efforts to collect upon the unlawful debts by, among other things, approving early payoff terms,

settlement agreements and other financial arrangements with borrowers to collect upon the

unlawful debt.

212.    The John Doe Investors ultimately benefit from the Enterprise's unlawful activity

when the proceeds of collecting upon the unlawful debts are funneled to the John Doe Investors

according to their level of participation in the usurious loans.

213.    In this case, GREEN TREE, through the respective individual John Doe

Defendants: (i) solicited borrowers; (ii) pooled funds from John Doe Investors to fund the

agreements; (iii) underwrote the agreements; (iv) entered into the agreements; and (v) collected

upon the unlawful debt evidenced by the agreements by effecting wire transfers from the bank

accounts of Plaintiffs.

**E.    Interstate Commerce**

214.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

215.     Specifically, members of each Enterprise maintain offices in New York, and allegedly Delaware and Connecticut, and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

216.    In the present case, all communications between the members of the Enterprise were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the agreements, fund the advances under each of the agreements and collect the payments via interstate electronic ACH debits.

**F.    Injury and Causation.**

217.    Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

218.    Plaintiffs were forced to make daily payments pursuant to the MCA Agreement that amounted to unconscionable interest rates.  Plaintiffs have paid at least $1,437,500.00 in criminally usurious, fraudulent, and unenforceable interest.

219.    Additionally, as a result of their accounts being frozen, Plaintiffs were unable to make payroll and suffered, upon information and belief, more than $1 million dollars in almost

immediate damages to their business and reputation, and millions of dollars in additional damage thereafter, the full amount of which cannot yet be quantified.  The corporate Plaintiffs have almost no working capital with cash balances that are less than $150,000 in the aggregate, when they should have millions on hand.  Plaintiffs were forced to stop working with a great deal of clients as they couldn't afford to pay the therapists for their time.  Many of Plaintiffs' independent contractors left as a result of the inability to pay.  Plaintiffs were unable to pay their obligations as they became due, and are now being forced to attempt to restructure and reorganize their debt.  Plaintiffs are facing foreclosure on a line of credit they were unable to pay.  Plaintiffs have been forced to reduce their workforce and postpone all work on a strategy to raise funds.  All marketing and investments in office space has been postponed indefinitely.  Plaintiffs now have significant accounts payable outstanding with a number of vendors.  A number of business partners have postponed any investment in the entities until Plaintiffs have their funds available.  Due to Defendants' actions, Plaintiffs have already lost approximately 50% of their business, and are in severe risk and danger of losing the remainder.

220.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) thus include, but are not limited to, millions of dollars in improperly collected usurious loan payments, loss of revenue, and harm to Plaintiffs' business and reputation.

221.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

222.    Under controlling New York law, the MCA Agreement is void *ab initio*, and thus these are actual incurred damages to Plaintiffs. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612 (2021).

223.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (Conspiracy under 18 U.S.C. § 1962(d))

224.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

225.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed with members of each Enterprise to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

226.    By and through the Enterprise Members' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants and the Enterprise Members concerning the underwriting, funding, servicing and collection of the unlawful loans, including the Agreement, the respective Defendants knew the nature of the Enterprise and Defendants knew that the Enterprise extended beyond each Enterprise Member's individual role. Moreover, through the same connections and coordination, Defendants knew that the other Enterprise Members were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

227.    The respective Defendants each agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts, including the Agreement, in violation of 18 U.S.C. § 1962(c). In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Enterprise Members shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful

debts, including the Agreement.

228.    The Defendants agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit and/or allow the commission of wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

229.    The Defendants also agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to commit or allow the commissions of the interstate transportation of money obtained by fraud in violation of 18 U.S.C. §2314.

230.    The participation and agreement of the Defendants and each Enterprise Member was necessary to allow the commission of this scheme.

231.    Plaintiffs have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

232.    The injuries to the Plaintiffs directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, improperly collected loan payments, loss of business and goodwill, and lost profits.

233.    Plaintiffs were forced to make daily payments pursuant to the MCA agreements that amounted to unconscionable interest rates.

234.    Plaintiffs have also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

235.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

## THIRD CAUSE OF ACTION
### (In the Alternative, Breach of Contract)

236.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

237.    Under the MCA Agreement, Defendants promised to advance $2.5 million dollars.

238.    Defendants did not advance the amounts as promised.

239.    Instead, Defendants breached the parties' contract by charging Plaintiffs $500,000 in sham origination fees, which Defendants allege was for its "underwriting and the ACH debit program, as well as related expenses," even though Defendants had little to no underwriting or expenses.

240.    Defendants' material breach thus relieved Plaintiffs of any further obligations under the agreement.

241.    Because Plaintiffs were therefore never in breach, Defendants' subsequent conduct in obtaining judgments and attempting to enforce and collect upon those judgments through the tactics used, such as freezing and levying Plaintiffs' assets, was a further breach of contract by Defendants.

242.    The attorney Defendants knowingly participated in this breach and tortiously enforced a contract that they knew or should have known was unlawful.

243.    Upon information and belief, the attorney Defendants have filed over 2,000 collection cases.  They therefore were or should have been well aware that a collection attorney cannot take an arbitrary percentage of an outstanding amount owed as attorney's fees when that number is grossly disproportionate to the amount of work done.  The attorney Defendants knew that a collection case does not involve $700,000+ in attorney's fees.  In fact, in the cases that

they have filed in Connecticut on behalf of the Enterprise, the attorney Defendants have repeatedly stated to the courts that they anticipate attorney's fees of a few thousand dollars to a few ten thousand dollars at most.  Moreover, in the cases that the Enterprise has filed with their predecessor counsel, those predecessor attorneys have submitted affidavits saying that their fees were less than a thousand dollars to at most less than two thousand dollars.  Accordingly, the attorney Defendants knew that their claim of $700,000 in attorney's fees for the filing of a confession judgment was patently absurd and dishonest.

244.    As a direct and proximate result of Defendants' breach of the MCA Agreement, and subsequent actions in levying against Plaintiffs' bank accounts, Plaintiffs have been damaged in the amounts described in detail above.

245.    In the event that the Court finds that the MCA Agreements are valid and enforceable and not void ab initio as a matter of law, then as an alternative ground for relief, Plaintiffs are still entitled to direct and consequential damages caused by Defendants' breach of the MCA Agreement.

### FOURTH CAUSE OF ACTION
#### (Breach of Contract)

246.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

247.    The parties' MCA Agreement, in five different places (Sections 1.8, 1.13, 1.15, Appendix A), makes reference only to "reasonable attorney's fees" in the event that GREEN TREE was entitled to judgment.

248.    Defendants, however, filed for $700,000+ in alleged attorney's fees for nothing more than the filing of a confession of judgment, which clearly is not reasonable attorney's fees.

249.    In fact, the Supreme Court vacated the judgment on those very grounds, holding that the attorney's fees were "grossly disproportionate to the legal services rendered," and therefore "unlawful."

250.    Defendants used the additional $700,000+ in their judgment to freeze an additional $700,000+ of Plaintiffs' money.

251.    Because this additional money was frozen, Plaintiffs suffered substantial harm, including an inability to make payroll, which led to significant harm to Plaintiffs, including the loss of staff, business, reputation, and goodwill.

252.    Defendants' breach of the agreement thereby caused Plaintiffs significant damages in an amount to be determined at trial, but believed to be no less than $1 million dollars.

253.    The attorney Defendants knowingly participated in this breach and unlawful judgment and collection that they knew or should have known was unlawful.  As collection attorneys who have filed over 2,000 cases, they knew or should have known that it is unlawful for a collection attorney to take an arbitrary percentage of an outstanding amount owed as attorney's fees when that number is grossly disproportionate to the amount of work actually done.

254.    Additionally, the attorney Defendants also knew or should have known that the contract did not entitle GREE TREE to $700,000+ in attorney's fees.  The attorney Defendants cannot claim that they were not aware of the provisions of the contract, because they filed a copy of the contract as part of their confession judgment.  Yet, they allowed GREEN TREE to file a judgment stating that it was entitled to $700,000+ in attorney's fees, and then engaged in abusive and aggressive enforcement tactics as described above.

255.    As a direct and proximate result of Defendants' breach of the MCA Agreement,

and subsequent actions in levying against Plaintiffs' bank accounts, Plaintiffs have been

damaged in the amounts described in detail above.


**FIFTH CAUSE OF ACTION**
**(Wrongful Restraint and Execution/Trespass to Chattel)**

256.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

257.    As discussed above, following their obtaining of the Clerk's judgment without

notice or opportunity to object, Defendants sought to execute upon by such judgment by

restraining millions of dollars in Plaintiffs' bank account.

258.    On September 20, 2024, the Supreme Court, Kings County, vacated Defendants'

judgment, finding that it was unlawful.

259.    Defendants knew or should have known that the judgment was void and/or

unlawful, since it contained $700,000+ in attorney's fees for doing nothing more than filing an

affidavit of confession.

260.    As such, Defendants, who had wrongfully restrained Plaintiffs' funds on the basis

of such unlawful Clerk's judgment, became trespassers *ab initio*.

261.    As a result of Defendants' trespass, Plaintiffs suffered substantial harm, including

an inability to make payroll, pay vendors, pay debts as they became due, or provide certain

services to its customers, which led to significant harm to Plaintiffs, including millions of dollars

in loss of revenue and harm to Plaintiffs' business and reputation.

262.    The attorney Defendants knowingly participated in this unlawful restraint that

they knew or should have known was unlawful, and therefore were trespassers as well.

263.    Accordingly, Defendants are liable for the consequences of their acts as if the

judgment and execution never existed.

264.    As a direct and proximate result of Defendants' wrongful restraint and execution and their trespass to Plaintiffs' chattels, Plaintiffs have been damaged in the amounts described in detail above.


## SIXTH CAUSE OF ACTION
### (Violation of New York Judiciary Law §487)

265.    Plaintiffs repeat and re-allege the allegations of each of the foregoing paragraphs.

266.    New York Judiciary Law §487 allows a party to file a civil suit against an attorney who "is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party."

267.    Here the attorney Defendants at a minimum consented to the deceit or collusion of GREEN TREE with the intent to deceive the court and Plaintiffs.

268.    Despite knowing that the contract did not provide for 25% of the outstanding debt in attorney's fees, GREEN TREE deceived Plaintiffs into signing such an affidavit.

269.    The attorney Defendants then allowed GREEN TREE to file an affidavit with the Kings County Clerk stating that GREEN TREE was entitled to $700,000+ in attorney's fees for its confession judgment.

270.    The attorney Defendants allowed these papers to be filed with the court because they were presumably the recipients of the $700,000+, and therefore stood to directly gain from the additional amount added to the confession judgment.

271.    This unlawful $700,000+ caused substantial harm of millions of dollars to Plaintiffs, as discussed above.

272.    Pursuant to Judiciary Law §487, the attorney Defendants are therefore liable to Plaintiffs for treble damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally:

a)    Awarding Plaintiffs direct and consequential damages in an amount to be proved at trial, but believed to be no less than $4.5 million;

b)    Awarding Plaintiffs treble damages;

c)    Awarding Plaintiffs their attorney's fees and costs incurred in this action; and

d)    Granting such other and further relief as this Court deems just and proper.

Dated: Fresh Meadows, New York
       November 7, 2024

    /s/ Jonathan E. Neuman
JONATHAN E. NEUMAN, ESQ.
*Attorney for Plaintiffs*
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com